## Court of Appeals.

*June,* 1885.

## PEOPLE *v.* PETMECKY.

(Affirming 2 *N. Y. Crim. Repts.* 450.)

FALSUS IN UNO FALSUS IN OMNIBUS.——JUDGE'S CHARGE, CONSTRUC-
TION OF.——MURDER IN FIRST DEGREE.

Upon the trial of an indictment for murder in the first degree, the only
direct evidence connecting defendant with the perpetration of the
offense, was his own testimony, in which he admitted the killing of
deceased, claiming that the act was done in self-defense. In his tes-
timony, defendant involved himself in various inconsistencies and
contradictions, and in the circumstantial evidence adduced on
behalf of the prosecution, there was much which was irreconcilable
with the truth of his testimony. The material question submitted
to the jury was as to the degree of credibility to be accorded to
defendant's testimony. After the judge had charged the jury at
length on this point, the prisoner's counsel excepted "to the charge,
that the testimony of the prisoner was entitled to no weight, except
as corroborated by others," whereupon the judge disclaimed this
interpretation of his charge, and said, "I have not said that, gentle-
men," and proceeded to explain the meaning he attached to the lan-
guage used, to which explanation there was no exception.

*Held,* upon an exhaustive review of the testimony and the language of

the charge, (1) that conceding this exception raised the question argued before the appellate court, and considering the charge as a whole, there is no reasonable ground for claiming that any part of the evidence was thereby intended to be withdrawn from the consideration of the jury; that there is no express language authorizing the claim made, and it cannot be fairly implied from the language used by the court; (2) that even if this were otherwise, it is an unwarrantable construction to ascribe to the court a meaning which it expressly disclaims, and an improbable assumption to say that a jury would be likely to act on an instruction which the court had unequivocally declared it did not intend to make.

A charge that a witness who testifies to a willful falsehood is not entitled to credit, and that the jury, from that fact, are authorized to disbelieve his entire testimony, is not open to objection.

Whether or not a direction to the jury to wholly disregard the defendant's testimony in making up their verdict, if they should find that he had intentionally testified falsely as to any material fact, embraces an erroneous rule, *quære?*

People *v.* Hovey, 1 *N. Y. Crim. Rep.* 283; and People *v.* Boas, *Ib.* 287, followed, as to necessity of exceptions to bring up questions for consideration of Court of Appeals.

APPEAL from a judgment of the General Term of the Supreme Court in the Fifth Department, October, 1884 (2 *N. Y. Crim. Rep.* 450), affirming a judgment convicting defendant, Franz Joseph Petmecky, of the crime of murder in the first degree.

The facts and exceptions are fully set forth in the opinion.

*John W. O'Brien,* for the prisoner, appellant.

*Richard C. Steele,* for the people, respondent.

RUGER, Ch. J.—The defendant was convicted of the crime of murder in the first degree, at a court of Oyer and Terminer, held in Cayuga county in January, 1884.

The indictment charged him with the act of killing one Paulina Froitzheim, at the city of Auburn, on June 1, 1883, with malice aforethought, and from a deliberate and premeditated design to effect her death. Another count was to the effect that the commission of the same crime was effected by

him while engaged in the perpetration of a felony, to wit ; grand larceny.

The evidence shows that the crime was committed on the day alleged, at the residence of the deceased, in the city of Auburn, between the hours of one and five o'clock P. M., by numerous blows inflicted on the head and body of the deceased, with a hatchet and other dangerous weapons, and that the defendant and the deceased were the only persons present at the time of its commission. No witness saw the parties together during these hours, or knew of the occurrence until after five o'clock of the day named. The evidence of · the prosecution, however, tended strongly to show that the defend-ant was the perpetrator of the crime, and when called as a witness in his own behalf, he admitted that the wounds causing her death were inflicted by himself.

This testimony left, as the only question for the considera-tion of the jury, that of the motives which influenced the defend-ant in perpetrating the crime. He testified that it was done in self-defense, and the material question submitted to the jury was as to the degree of credibility to be accorded to his testi-mony in establishing his alleged justification, and the absence on his part of the deliberation and premeditation required by the statute to constitute the crime of murder in the first degree.

The evidence showed that the defendant emigrated to this country from Prussia, about the year 1880, and, being related to the family of the Froitzheims, went immediately there on his arrival, and became an inmate and boarder with them at their residence in Auburn. He was then a young man about twenty-one years of age, who had come to this country for the purpose of obtaining employment by which to support himself, and the deceased was a married woman of mature age, living with her husband and being the mother of two grown-up sons, who were also inmates of the family. It was testified to by the defendant that soon after he took up his residence with the Froitzheims, the deceased began to profess a passionate attachment for him, and annoyed him by constant and repeated declarations of affection, which were continued to such an extent, that after a period of five months' endurance, he left the Froitzheims and engaged board at other places for the

period of an additional year, during which he was prosecuting his employment as a mechanic in Auburn. After this period, the defendant did not again reside in Auburn, but removed to. Cleveland, and after living awhile at that place and in Canada, he returned to Prussia. There he resided and worked at his trade until February, 1883, when he returned to the city of New York, and resided there until the time of the homicide. While residing there he absented himself from the city for four days in May, during which time he visited Madison county and married a Swiss girl with whom he became acquainted on his last voyage to this country. After remaining with his wife for two days, he abandoned her penniless at Syracuse, and returned to New York.

The evidence tended to show that in April or May, 1882, while the defendant was living at Cleveland, he met the deceased by appointment at Syracuse, and remained with her at a hotel for about two days and nights, subsequent to which time they did not meet again until the day of the homicide. It was also claimed by the defendant that frequently after leaving Auburn, he received letters from the deceased, requesting to see him, and that, shortly before leaving New York on May 30, 1883, he received a letter from her, asking him to visit Auburn, stating that she had something she wished to tell him. The letters were not produced in evidence, the defendant claiming that he had destroyed them. The direct testimony of the defendant was to the effect that he started from New York the afternoon of May 30, and arrived in Auburn at 4.35 P. M., the day after; that he visited the Froitzheim house the succeeding forenoon, and had an interview with the deceased, during which she made an appointment for him to call again in the afternoon, while her husband was absent at his work; that he did call again, about two o'clock in the afternoon, and the deceased then told him that she wanted to leave her husband and go away, and thereafter live with him. Upon the defendant's replying that he would not do this, and that he was married, the deceased became enraged, and struck him in the face, and seized him by the throat; that he thereupon drew his loaded revolver from his pocket for the purpose of scaring her; that he struck her with it on the head, and during the struggle

ensuing, the revolver dropped on the floor and was picked up by the deceased; that she then forced him into the kitchen, menacing him by threats and with the revolver, until he backed up against the stove, and, being unable to retreat any farther, seized a hatchet from the wall and struck her the blows producing death; that during this time he was not in his right mind, and acted instinctively and unconsciously in striking the deceased; that he then arranged his clothes, washed his hands in a bowl standing near, took an overcoat from the house, and at 5.55 P. M., left on the train of the New York Central Railroad for Albany. While on board of the train between Auburn and Syracuse, he found in the pockets of the overcoat taken by him, a savings bank book, two watches and a cigar-holder.

The defendant was arrested next morning at Albany, while attempting to procure money upon a savings bank deposit-book belonging to Martin Froitzheim.

Upon his cross-examination the prisoner admitted that he took the bank-book from a bureau with the intention of using it in obtaining money to get away with, and to keep him while staying in New York, and that he took one of the watches from the wall, and another from some place which he did not recollect. He claimed that he did not know that he took an undershirt which was found on his person when arrested, but admitted the taking of a pocket-book containing money, from a table in the sitting-room, after the killing had been accomplished. The defendant involved himself in other inconsistencies and contradictions which it is needless now to point out.

The evidence of the prosecution showed that the defendant, when arrested, had in his possession an overcoat, wrapper, two watches, a savings bank deposit-book, a pocket-book containing money, a gold ring, a watch, chain and cigar-holder, and other property belonging to different members of the Froitzheim family, and taken from their residence at the time of the commission of the homicide in question; that he signed the name of Martin Froitzheim to an order with which he was endeavoring to raise money upon the bank-book in question, and afterwards claimed that his name was Nathan Heymann, and that he had not been in Auburn, but obtained the book of a man in New York, who told him to take it and go to Albany and get the

money on it.   The evidence also tended to show the presence
of blood-stains in various places on the furniture, walls and
doors in the two stories of the Froitzheim house, and raising
the presumption that the defendant thoroughly examined the
premises after committing the homicide.

When the premises were first visited after the killing, the
outer doors of the house were all found to be locked and the keys
taken away ; a ring belonging to the defendant lay on the floor
near the body, and two buttons, apparently torn from his vest,
also lay near.   The hatchet, whose usual place of deposit was in
the woodshed, was found under the bed in a bed-room on the
first floor, stained with blood, and a bowl used for cooking pur-
poses stood on a chair near the body, filled with bloody water.
The defendant had been seen in the streets and lots near
Froitzheim's, on June 1, both before and after the commission
of the crime, and apparently attempting to conceal his identity
from those who formerly knew him.   On the forenoon of that
day, he inquired of a groceress in the vicinity, as to who the
inmates of Froitzheim's family then were, and whether they
were all at home, and as to the time when Andrew Froitzheim
returned from his work, and of other persons as to the time of
departure of the railroad trains over various roads running out
of Auburn.

From this abbreviated summary of the evidence given on
the trial, it will be seen while there are some facts tending to
corroborate portions of his testimony, there was also much that
was irreconcilable with its truth.

The synopsis given is quite as favorable to the prisoner as
the evidence will justify, and seems to present the bearing of
the only exception taken by his counsel, which was urged for
our consideration upon the argument.

In commenting upon the effect to be given to the defend-
ant's evidence, the trial judge, *inter alia*, stated that " A party
is now declared to be a competent witness in his own behalf,
and the question of the credit to be attached to his testimony,
is a question for the jury.   But the interest he has in the issue
is never to be excluded from the minds of the jury.   The testi-
mony is entitled to all the weight which the jury can fairly
give it, and was subject to the same tests as the testimony of

any other witness. So far as the testimony of the prisoner at the bar is contradictory of itself, it cannot be true. Two contradictory statements cannot be true. When he testifies he knew nothing of the personal property which he took from that house, until after he took the cars at Auburn, and when he testifies afterwards that he took the watch from the wall, and took the bank-book from the bureau drawer, so far as those statements are contradictory, one of them is to be considered false. Whenever you find that the prisoner has made a statement not true, to establish a falsity instead of a truth, his testimony is not entitled to the credit of a witness who stands fairly before you uncontradicted. His testimony then is entitled to no weight or credit of itself, except so far as it is consistent with the known and established facts of the case, or corroborated by other witnesses. This is a consideration which you cannot avoid; it is forced upon you by the facts of the case, and the importance of the issues here involved. When he testified that he had no purpose to draw any money on the bank-book, having been surprised at finding it in his possession on his way to Albany, and on his cross-examination says he took it from the bureau drawer, and that he took it with him with the intention to draw money upon it with which to escape to New York, and when, being reminded that he had money enough to go to New York, he testified that he intended to draw money upon it, enough to keep him in New York for a time, one of these statements must be false; and if intentionally false, the inference of a falsity attaches to the whole of the evidence which he has given in the case." After this statement of the rule, the court went on to say, "It is upon the whole of this testimony that you are to say whether he was unconscious of what he did during any of this time. If unconscious of what he did, it would seem that he would have been unconscious of what he saw, and yet he testifies that when he left the house he saw Mrs. Froitzheim sitting in the chair and clasping the revolver in her hand. According to his testimony, he was unconscious of that series of acts by which he locked all of the doors of the house. If he has not told the truth in regard to his unconsciousness during the whole period of time he remained in the house after Mrs. Froitzheim was rendered incapable of resistance, it will be for

you to say whether his testimony that he was unconscious during any period of the time, was credible."

When the court concluded its charge, the prisoner's counsel "excepted to the charge that the testimony of the prisoner was entitled to no weight, except as corroborated by others." Although this exception did not correctly state the language or spirit of the charge, yet conceding that it raised the question argued before us, we do not think the charge is justly susceptible to the construction placed upon it by the defendant's counsel. The trial judge immediately disclaimed, in the presence of the jury, the interpretation put upon it by the defendant's counsel, and replied, " I have not said that, gentlemen," and then proceeded to explain the meaning he attached to the language used. To this explanation, no exception was taken. Considering the charge as a whole, we do not think there is reasonable ground for claiming that any part of the evidence was intended thereby to be withdrawn from the consideration of the jury. The court did charge that a witness who testified to a willful falsehood is not entitled to credit, and that fact authorized them to disbelieve his entire testimony ; but this proposition we suppose to be indisputably correct. The appellant's contention is that it embraced a direction to the jury to wholly disregard the defendant's evidence in making up their verdict, if they should find that he had intentionally testified falsely as to any material fact.

If this contention could find support in the language of the charge, there is some authority for the claim that the rule laid down is erroneous ; but without deciding that question, we feel constrained to hold that the charge is not susceptible of the construction attempted to be put upon it. That a jury are permitted to disbelieve the testimony of a witness who has willfully testified falsely before them as to any fact, is not disputed, and the question here is whether the court below said anything more than this. That it did not intend to go beyond this instruction seems to us quite clear, not only from the prompt and decisive manner in which it disclaimed that interpretation when it was put upon its language, but also from the general tenor and effect of the charge. There is certainly no express language in the charge authorizing the claim made, and we do

not think it can be fairly implied from the language used by the court. Even if this were otherwise, we think that it is an unwarrantable construction to ascribe to the court a meaning which it expressly disclaimed, and an improbable assumption to say that a jury would be likely to act on an instruction which the court had unequivocally declared it did not intend to make.

That careful regard for the rights of accused persons, which the doctrines of the common law enjoin upon courts, requires them to be even astute in scrutinizing proceedings by which persons accused of crime may be unfairly jeopardized; but this rule does not call for the exercise of hypercritical construction, or the reversal of a judgment rendered after a long and pains-taking trial, upon speculative or impracticable considerations. The obvious design of the charge seems to have been to leave the questions of fact in the case entirely to the jury on the whole evidence in the case, and to instruct them as to the legal rules affecting the credibility of a witness. We think the rule was correctly laid down by the trial court. We do not now mean to hold that it might not go even further, and direct them wholly to disregard the evidence of such witnesses, but we deem it unnecessary to review the authorities or express any opinion on that point. It is enough in this case to hold that the circumstance referred to would impair the credibility of the witness, and that his whole testimony should be weighed by a jury in the light of such discrediting influences.

Other questions raised by the defendant's counsel in the argument before us, were not founded upon any exception, or where they were, no material evidence was given under them, and they present no questions which this court is authorized to consider. People *v.* Hovey, 92 *N. Y.* 554; 1 *N. Y. Crim. Rep.* 283; People *v.* Boas, 92 *N. Y.* 560; 1 *N. Y. Crim. Rep.* 287.

The judgment should therefore be affirmed.

All concur.